```
                    UNITED STATES DISTRICT COURT
                              FOR THE
                       DISTRICT OF VERMONT
```

Eric Gravel,                         :
    Plaintiff,                   :
                                 :
    v.                           :   File No. 1:07-CV-237
                                 :
Prison Health Services, Inc.,        :
Vermont Department of                :
Corrections Medical                  :
Department, and Dr. Pamela           :
Pederson,                            :
    Defendants.                  :

OPINION AND ORDER
(Papers 24 and 25)

Plaintiff Eric Gravel, proceeding *pro se*, brings this action claiming that the medical care he received in a Vermont prison violated his Eighth Amendment rights. The defendants now move for summary judgment, arguing that Gravel has failed to show that his medical care was inadequate. Also pending before the Court is Gravel's motion to compel judgment, in which he essentially responds to matters raised in the defendants' answer to the complaint. The defendants' summary judgment motion is unopposed.

For the reasons set forth below, the defendants' motion for summary judgment (Paper 24) is GRANTED, Gravel's motion to compel judgment (Paper 25) is DENIED, and this case is DISMISSED.

## Factual Background

The amended complaint alleges that while incarcerated at the Northern State Correctional Facility, Gravel contracted an infection in his lower lip. By Gravel's own description, the swelling in his lip resembled "an ingrown hair, or spider bite." (Paper 21 at 3). He allegedly submitted several sick call slips, but did not receive an immediate response. He claims that he eventually approached a Correctional Officer about the problem, who in turn contacted medical services.

Gravel alleges that he was then seen by Dr. Pamela Pederson. He charges that, at first, Dr. Pederson scolded him for bypassing the sick call procedure. After conducting an examination, she diagnosed the problem as an allergic reaction. Gravel claims that Dr. Pederson disregarded his suggestion that the swelling might be the result of a methicillin resistant staphylococcus aureus ("MRSA") infection.

The amended complaint goes on to claim that within a few days Gravel's condition had worsened. He was again attended to by Dr. Pederson, who ordered that a culture be taken and that Gravel be provided antibiotics consistent

2

with treatment of MRSA. Gravel was also placed in special housing until his condition improved.

Gravel alleges that Dr. Pederson intentionally misdiagnosed him, and that her treatment violated his constitutional rights. Specifically, he claims that Dr. Pederson "intentionally withheld medical treatment by misdiagnosing the Plaintiff's condition as a means to punish the Plaintiff for allegedly circumventing the sick call remedy procedure." Id. at 5. As a result of Dr. Pederson's alleged misconduct, Gravel claims to have suffered permanent nerve damage and scarring.

At summary judgment, Dr. Pederson has submitted a detailed affidavit to which Gravel has offered no direct response. Her affidavit states that Gravel filed a sick-call request on August 20, 2006, complaining of a swollen lip that might be the result of a spider bite. He submitted another request the following day, claiming that his lip was swollen, hard, and painful.

Dr. Pederson attended to Gravel on August 22, 2006. Upon examination, Gravel denied any trauma or history of lip swelling, and reported that when he had tried to cut his lip with a clean razor to release fluid, the lip only bled.

(Paper 24-3 at 3). Dr. Pederson diagnosed the swelling as angioedema, possibly secondary to Chlor-Trimeton ("CTM"), an antihistamine Gravel was using. Her "plan was to have him discontinue CTM, provide Benadryl and apply cool compresses. He was instructed to notify the staff immediately if he experienced difficulty in swallowing or breathing." Id. On August 23, 2006, nursing staff administered epinephrin to help reduce the swelling.

Dr. Pederson saw Gravel again on August 24, 2006 for a follow-up visit. His lip was more swollen, and a scab was forming "at the vermillion border." Id. Dr. Pederson's diagnosis remained angiodema, and she ordered continued treatment with ice, Motrin and Benadryl.

On August 25, 2006, Dr. Pederson saw Gravel after he reported increased swelling and small amounts of yellow discharge in his lip. Dr. Pederson noted "marked swelling of the lower lip with two open areas on the lip and on the buccal mucosa. No drainage was seen. My assessment remained angioedema." Id. at 5. Although she did not believe there was a secondary infection, Dr. Pederson ordered a culture of the wound discharge. She also asked

4

that Gravel be placed in "sheltered housing" and be provided prednisone for three days. Id.

On August 26, 2006, Gravel was checked by the nursing staff and stated that his lip was "OK today." The nurse observed that his lip was still swollen on the left to the middle, and that the right was slightly swollen. Ice and medication were continued as ordered.

On August 27, 2006, the lab results from the culture revealed that Gravel had a MRSA infection. That afternoon, nursing staff contacted a second doctor, who ordered that the penicillin prescribed for Gravel by a dentist for an unrelated problem be discontinued. The doctor did not order any other changes in Gravel's treatment. Id. at 6.

Dr. Pederson saw Gravel on August 28, 2006. "I noted that the preliminary culture and sensitivity report indicated MRSA. I also noted that the swelling and pain were now much less, but [that Gravel] had developed purulent drainage on two spots." Id. Dr. Pederson ordered a re-culture to confirm MRSA, and prescribed antibiotics. She also ordered warm compresses four times a day. Id. at 6-7.

Gravel did not report any further complaints about his condition until October 18, 2006, when he submitted a sick

5

call slip complaining of a swollen lower lip. Dr. Pederson attended to him on October 20, 2006. Gravel informed Dr. Pederson that he was suffering from persistent swelling in his lower lip, particularly in the morning. Dr. Pederson "noted his history of angioedema and secondary MRSA infection after self-inflicted wound with a razor blade in August, 2006." Id. at 7. Gravel stated that he wanted to cut his lip open again, and Dr. Pederson advised him to use warm compresses instead. "Plaintiff did not have an active infection at this time." Id.

Gravel submitted a series of sick call requests in November and December, 2006, none of which pertained to his lip. On January 3, 2007, however, he submitted another sick call request complaining of a swollen lip. Two days later he was seen by a nurse practitioner, at which time he complained of skin infections all over his body. He informed the nurse that he had a history of skin lesions, and that he would cut them off with nail clippers. The nurse practitioner recommended applying an antibiotic ointment to the lesions after washing them with soap and water. Id. at 8.

Gravel did not have any further complaints related to his lip until April 2007. For three consecutive days, beginning on April 11, 2007, he submitted sick call slips complaining of lip swelling. On April 14, 2007, he was seen by the nursing staff, who in turn received a telephone order from Dr. Mitchell Miller to start him on an antibiotic and obtain a sample to culture.

Dr. Pederson attended to Gravel on April 17, 2007. Gravel reported that he had experienced a fever two nights before, but that the swelling had decreased since he began taking the antibiotic. He was not suffering from a fever at the time of his examination, but did have swelling and "a pin-hole opening draining blood." Id. at 9. Dr. Pederson suspected a recurrence of MRSA. "My plan was to continue him in a holding cell and keep him on [the antibiotic] and to apply warm compresses. I also started him on [a second antibiotic]." Id. Test results from the culture were positive for MRSA.

Dr. Pederson did not treat Gravel again after April 17, 2007. She did review his medical records since that time, and found no further lip-related complaints. Id.

7

Dr. Pederson's affidavit sets forth her reasons for treating Gravel as she did. First, she states her opinion that her initial diagnosis of angioedema was correct, and that Gravel only developed an infection as a result of cutting his lip. "His report that he did not release anything but blood confirms that this was angioedema and not an infectious process. By disturbing the skin, Plaintiff exposed himself to infection." Id. at 10.

Once Gravel contracted MRSA, antibiotics were provided. "Plaintiff reacted favorably to the administration of these medications. While Plaintiff may have had some slight scarring on the inside of his lip that he can feel, there was no change in his appearance from when I last observed him." Id. at 11.

On the issue of whether she scolded Gravel for circumventing the sick call slip process, Dr. Pederson states that she has "no recollection of ever being upset by the manner Plaintiff used the sick call procedure." She insists, however, that she treated Gravel as she would have any other inmate, and calls his claims "false and offensive." Id. at 13.

8

The defendants in this case are Prison Health Services, Inc., the Vermont Department of Corrections, and Dr. Pederson. Gravel's factual allegations all center on the actions of Dr. Pederson.

## Discussion

I. Summary Judgment Standard

Under Rule 56(c) of the Federal Rules of Civil Procedure, a motion for summary judgment may not be granted unless the Court determines that there is no genuine issue of material fact to be tried, and that the undisputed material facts warrant judgment for the moving party as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Salahuddin v. Goord, 467 F.3d 263, 272-73 (2d Cir. 2006); Williams v. Utica Coll. of Syracuse Univ., 453 F.3d 112, 116 (2d Cir. 2006). The burden of demonstrating the absence of any genuine dispute as to material facts rests upon the party seeking summary judgment. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). Once a properly supported motion for summary judgment has been made, the burden shifts to the non-moving party to make a sufficient showing to establish the essential elements of that party's case on which it bears the burden of proof at

trial.  Hayut v. State Univ. of N.Y., 352 F.3d 733, 743 (2d Cir. 2003).

The non-moving party must put forth "specific facts showing there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  In assessing the record to determine whether there is a genuine issue to be tried as to any material fact, courts are required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Patterson v. County of Oneida, 375 F.3d 206, 219 (2d Cir. 2004).  Nevertheless, a party opposing a motion for summary judgment cannot rely on mere speculation or conjecture.  See, e.g., Conroy v. N.Y. State Dep't of Corr. Servs., 333 F.3d 88, 94 (2d Cir. 2003) ("[M]ere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment.").  Moreover, "proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment."  See Viscusi v. Proctor & Gamble, 2007 WL 2071546, at * 9 (E.D.N.Y. July 16, 2007).

Finally, the fact that the defendants' summary judgment motion is unopposed does not relieve the Court of its "duty

to decide whether the movant is entitled to judgment as a matter of law." Vermont Teddy Bear Co. v. Beargram Co., 373 F.3d 241, 242 (2d Cir. 2004). A plaintiff's failure to oppose summary judgment allows the Court to accept the defendants' factual assertions as true; however, the Court "must be satisfied that the citation to evidence in the record supports the assertion." Id.

II. Eighth Amendment

Gravel claims that his medical care violated his rights under the Eighth Amendment. To show that prison medical treatment was so inadequate as to amount to "cruel and unusual punishment" prohibited by the Eighth Amendment, Gravel must prove that a defendant's actions or omissions amounted to "deliberate indifference to a serious medical need." Estelle v. Gamble, 429 U.S. 97, 106 (1976). The "deliberate indifference" component includes both an objective and subjective element. Wilson v. Seiter, 501 U.S. 294, 298-299 (1991). With respect to the objective aspect, the Court must ask whether there has been a sufficiently serious deprivation of the prisoner's constitutional rights. Id. "[O]nly those deprivations denying 'the minimal civilized measure of life's

necessities' are sufficiently grave to form the basis of an Eighth Amendment violation." Id. at 298 (quoting Rhodes v. Chapman, 452 U.S. 337, 347 (1981)). Thus, Eighth Amendment protection is limited to "a condition of urgency that may result in degeneration or extreme pain." Chance, 143 F.3d at 702.

With respect to the subjective aspect, the Court must consider whether the deprivation was brought about by a defendant in wanton disregard of those rights. Wilson, 501 U.S. at 298-99. To establish indifference of a constitutional magnitude, plaintiff must prove that the defendant had a culpable state of mind and intended wantonly to inflict pain. See id. at 299.

Mere negligence is not actionable. "A [prisoner's] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eight Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." Estelle, 429 U.S. at 106. Rather, the plaintiff must allege conduct that is "repugnant to the conscience of mankind" or "incompatible with the evolving standards of decency that mark the

12

progress of a maturing society." Id. at 102, 105-06. It is clear, then, that allegations of malpractice alone do not state a constitutional claim. Id. at 106 n.14; Chance, 143 F.3d at 703-04.

Likewise, an inmate's "mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." Chance, 143 F.3d at 703.

In this case, the defendants do not question whether Gravel suffered from a sufficiently serious medical condition. Instead, their motion focuses on the issue of deliberate indifference, arguing that Gravel's medical care met or exceeded the standard of care, and that the undisputed record belies any claim of knowing disregard for his well-being.

The defendants summarize Gravel's claims as a "belief that Dr. Pederson should have diagnosed and treated MRSA earlier." (Paper 24 at 15). While it is true that Dr. Pederson did not diagnose MRSA immediately, her reasoning is clearly set forth in her affidavit. Dr. Pederson states

13

that her initial diagnosis of angioedema was correct, based upon Gravel's symptoms at that time. She explains that "[angioedema] is a condition that occurs predominantly on the skin of the face, normally around the mouth and the mucosa of the mouth. Characteristically, it is manifested by swelling developed over a short period of time . . . . The cause for this condition is essentially unknown. However, heredity or recent exposure to allergens is [are] thought to be precipitating causes."  (Paper 24-3 at 9-10).

When Gravel presented with symptoms consistent with angioedema, Dr. Pederson ordered that he stop taking a suspected allergen (CTM) and prescribed antihistamines. Gravel was also provided a steroid and an injection of epinephrin, both of which were intended to address the swelling.  Id. at 10.  Nothing in this initial treatment suggests indifference to Gravel's medical condition. Indeed, the treatment was timely, with regular follow-ups, and according to the only medical evidence presented, was appropriate given Gravel's initial symptoms.

Gravel later developed an infection, which Dr. Pederson attributes to the fact that he cut himself in an effort to drain any fluid.  "His report that he did not release

14

anything but blood confirms that this was angioedema and not an infectious process. By disturbing the skin, Plaintiff exposed himself to infection." Id. Once there was a sign of infection, a culture was ordered and antibiotics were subsequently prescribed.

Gravel claims that Dr. Pederson deliberately delivered sub-standard care because of personal animus against him. He also claims that she was aware of other MRSA cases, but treated his case differently. The allegations in his complaint are re-asserted in an affidavit submitted prior to the defendants' summary judgment motion. (Paper 16).

To the extent that Gravel alleges personal animus, Dr. Pederson has no recollection of ever being upset about the manner in which he used the sick call procedure. Id. at 12. Even if the Court accepts Gravel's version of the facts, however, this incident does not decide the Eighth Amendment question. Absent a showing of "culpable recklessness," there was no constitutional violation. Chance, 143 F.3d at 702.

Nor does Dr. Pederson recall Gravel mentioning MRSA during the initial examination. Assuming that Gravel did mention MRSA, it would be unreasonable to expect Dr.

15

Pederson to base her diagnosis upon a patient's suggestion. In sum, there is nothing in the record aside from Gravel's own beliefs indicating an Eighth Amendment violation. Stated somewhat differently, the record is devoid of any evidence that Dr. Pederson's conclusions were anything other than conscientious medical judgments, and the Court finds that no reasonable jury could conclude that her treatment of Gravel constituted deliberate indifference. The defendants are, therefore, entitled to summary judgment on Gravel's Eighth Amendment claim.

III. Medical Malpractice

The defendants are also entitled to summary judgment to the extent that Gravel is bringing a claim of medical malpractice. Under Vermont law, a plaintiff bringing such a claim must prove: (1) the proper standard of medical skill and care; (2) that the defendant either lacked the requisite knowledge or skill or failed to exercise this degree of care; and (3) that as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care, the plaintiff suffered injuries that would not have otherwise been incurred. 12 V.S.A. § 1908; Lockwood v. Lord, 163 Vt. 210, 213 (1994). "These elements must

16

generally be proved by expert testimony." Lockwood, 163 Vt. at 213 (citing Begin v. Richmond, 150 Vt. 517, 520 (1988)).

Gravel has not offered evidence to support any of the elements of a medical malpractice claim. Specifically, he has provided no evidence or testimony about the standard of care. Consequently, he cannot establish that the defendants breached that standard. Furthermore, while he claims that he was harmed by Dr. Pederson's alleged misdiagnosis, he has not provided any evidence, expert or otherwise, to show that his alleged injuries resulted from an initial failure to provide him with antibiotics.

The only evidence before the Court on any of these issues is the sworn, undisputed testimony of Dr. Pederson, which states that Gravel's treatment was in accordance with the standard of care. (Paper 24-3 at 13-14). Dr. Pederson attests that her diagnoses were based upon Gravel's symptoms, and that the treatments she ordered were both prompt and appropriate. Id. at 13. While Gravel claims that he should have been placed on antibiotics immediately, Dr. Pederson states that doing so would have been "contrary to the exercise of the standard of care" as it would present "a risk to the patient and other individuals in light of

concerns regarding bacterial resistance to antibiotics." Id. at 12.

Because Gravel has not offered anything to refute Dr. Pederson's statements, or to address his burden as to the elements of medical malpractice, the defendants are entitled to summary judgment.

IV. Gravel's Motion to Compel Judgment

On the same day that the defendants filed their motion for summary judgment, the Court received from Gravel a filing entitled "Plaintiff's Motion To Compel Judgment." (Paper 25). The filing responds directly to each of the 18 affirmative defenses set forth in the defendants' answer. After addressing each affirmative defense in a conclusory fashion, Gravel asks for a judgment in his favor.

Gravel's motion does not comply with the requirements of Fed. R. Civ. P. 56, or with any other rule applicable to a dispositive motion. Moreover, for the reasons set forth above, judgment must be entered in favor of the defendants. Gravel's motion to compel judgment is, therefore, DENIED.

Conclusion

For the reasons set forth above, the defendants' motion for summary judgment (Paper 24) is GRANTED and the

plaintiff's motion to compel judgment (Paper 25) is DENIED. Because the record evidence fails to establish unconstitutional or negligent conduct by Dr. Pederson, all claims against Pederson, Prison Health Services, Inc., and the Vermont Department of Corrections are DISMISSED with prejudice.

SO ORDERED.

Dated at Brattleboro, in the District of Vermont, this 19th day of May, 2009.

/s/ J. Garvan Murtha  
J. Garvan Murtha  
United States District Judge